NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-813

COMMONWEALTH

vs.

JHEREMY N. SANCHEZ.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a jury trial in the Lawrence District Court, the defendant was convicted of carrying a firearm without a license, G. L. c. 269, § 10 (a); carrying a loaded firearm without a license, G. L. c. 269, § 10 (n); and discharging a firearm within 500 feet of a building, G. L. c. 269, § 12E.[1] Because we conclude that the evidence was sufficient to support the convictions and any error in the admission of that evidence does not require us to disturb the jury's verdicts, we affirm.

Discussion. 1. Sufficiency of the evidence. "Challenges to the sufficiency of the evidence are evaluated under the

---

[1] The defendant was tried with a codefendant, Angel Pimental. Only the defendant's appeal is before us.

Latimore standard, that is, whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Commonwealth v. Witkowski, 487 Mass. 675, 679 (2021), quoting Commonwealth v. Latimore, 378 Mass. 671, 677 (1979).  After careful review, we are satisfied that the evidence here was sufficient to show that the car pictured in a video recording of the shooting at issue was the gray Nissan in which the defendant was later seen, that the defendant was seated in the front passenger's seat of that Nissan at the time of the shooting, and that he discharged a "firearm" as that term is defined for the purposes of G. L. c. 269, §§ 10 and 12.  See G. L. c. 269, § 10 (a) (prohibiting unlicensed possession of "a firearm . . . as defined in [G. L. c. 140, § 121]"); G. L. c. 269, § 10 (n) ("Whoever violates paragraph (a) . . . , by means of a loaded firearm, . . . shall be further punished" by consecutive sentence of incarceration); G. L. c. 269, § 12E (criminalizing discharge of "a firearm as defined in [G. L. c. 140, § 121] within 500 feet of a . . . building in use"); G. L. c. 140, § 121 (defining "firearm" as including "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can

2

be discharged and of which the length of the barrel or barrels is less than [sixteen] inches").

Viewed under the Latimore standard, the evidence was that, at approximately 9:20 A.M. on March 5, 2022, shots were fired from the passenger's side of a moving car on Pearl Street in Lawrence.  A security camera on a neighboring home created a video recording of the shooting, and the police took a still photograph of the car from a different video recording.  Based on these and other video recordings that the police collected from municipal and private video cameras throughout the city, and the testimony of the Commonwealth's witnesses, the jury could have concluded that the car involved in the Pearl Street shooting was a gray four-door Nissan sedan with New Hampshire license plates, lowered windshield visors, a distinctive pair of decals in the front window, and wheel rims of a particular style.

The jury could also have found that, after leaving the scene of the shooting, the same gray Nissan drove from Pearl Street to Melrose Court, where it stopped behind the building at 6 Hancock Street -- the home of codefendant Angel Pimental.  The Nissan's driver briefly left the car, went into 6 Hancock Street through the back door, and then returned to the Nissan and drove away.  The Nissan then continued to Gigante Meat Market (market)

3

where the driver, whom the jury could have found was Pimental, parked.

At that point, the defendant got out of the Nissan's front passenger seat.[2] From the time of the shooting to the Nissan's arrival at the market, approximately fifteen minutes had elapsed. The jury could have concluded that no one got in or out of the passenger's side of the Nissan between the time of the shooting and the time the Nissan stopped at the market. Taken together, this evidence was sufficient to establish that the Nissan in which the defendant was riding when he arrived at the market was the same one from which the shots were fired on Pearl Street, and that the defendant was in the seat from which those shots were fired. See Commonwealth v. Spaulding, 495 Mass. 300, 309 (2025), quoting Commonwealth v. Shakespeare, 493 Mass. 67, 80 (2023) ("The inferences a fact finder may draw from the evidence 'need only be reasonable and possible and need not be necessary or inescapable'").

Even though the weapon used in the shooting was never recovered, the evidence was likewise sufficient to allow the jury to conclude that the shots were fired from a "firearm" -- a

---

[2] Video recordings made inside the market included images of the faces, clothing, and hairstyles of all three occupants of the Nissan, and permitted the jury to find that Pimental was the driver, and the defendant was the front seat passenger.

4

handgun having a barrel length under sixteen inches long. Although we agree with the defendant that the video of the shooting is too grainy and the resolution of that video is too poor to allow a reasonable juror to determine the barrel length of the weapon used, the video was not the only evidence on that point. The police found nine-millimeter shell casings at the scene of the shooting and a Glock magazine containing nine-millimeter shells in Pimental's home, where the gray Nissan stopped very shortly after the shooting. It was "reasonable and possible," even if not "necessary," Spaulding, 495 Mass. at 309, quoting Shakespeare, 493 Mass. at 80, for the jury to infer that the Glock magazine found at the codefendant's home was used in the discharge of nine-millimeter ammunition during the Pearl Street shooting, and that Pimental stopped at his home minutes after the shooting to leave the magazine there for safekeeping. See Commonwealth v. Thevenin, 82 Mass. App. Ct. 822, 827 (2012), quoting Commonwealth v. James, 424 Mass. 770, 778 (1997) (it is reasonable to believe that defendant would seek to hide evidence of criminal activity in his home, "particularly those items that were 'durable, [and] of continuing utility to [him]'"). Moreover, although there was testimony at trial that nine-millimeter rounds could be used in both rifles and handguns, and that Glock makes both rifles and handguns, Detective Alexander

5

Ovalles testified that "[the Glock magazine] could be inserted into a [nine-millimeter] Glock firearm;" that a nine-millimeter Glock firearm was a handgun; and that the barrel of the nine-millimeter Glock firearm was shorter than the average rifle's barrel length of sixteen inches.[3]  We conclude that the evidence was therefore sufficient to sustain the defendant's convictions. See G. L. c. 140, § 121; Commonwealth v. Sperrazza, 372 Mass. 667, 670 (1977) (testimony that witness saw defendant "draw a revolver" and that weapon "was a 'handgun'" was sufficient to establish that gun was "firearm").

2.  "BOPFI" evidence.  At trial, the Commonwealth called Kevin Scaplen, a retired member of the Massachusetts State police then working for the Department of Criminal Justice Information Services (DCJIS), to prove that, at the time of the shooting, the defendant did not possess a license to carry firearms.  To do so, Scaplen described his own search of certain firearms licensing databases (BOPFI search), testifying that, when he input the defendant's name and date of birth, the result

---

[3] None of the witnesses was asked whether the Glock magazine recovered from Pimental's home was compatible with any Glock rifles.  As a result, the jury heard only that the magazine was compatible with a nine-millimeter Glock handgun.

was "No Records Found."[4]  According to Scaplen, that result indicated that the defendant did not have a license to carry firearms.

Even assuming that the record supports the defendant's contention that Scaplen obtained the defendant's name and birthdate from a DCJIS colleague, Amy Conway, we are not persuaded that Scaplen's testimony violated the confrontation clause.  "The confrontation clause bars the admission of testimonial hearsay by a declarant who does not appear at trial, unless the declarant is unavailable to testify as a matter of law and the defendant had an earlier opportunity to cross-examine [that declarant]."  Commonwealth v. McGann, 484 Mass. 312, 316 (2020).  Here, the declarant, Scaplen, did testify, and the defendant had the opportunity to cross-examine him (although he opted not to do so).  We therefore discern no confrontation clause issue stemming from Scaplen's testimony about his own BOPFI search.  Cf. Commonwealth v. Encarnacion, 105 Mass. App. Ct. 46, 52-53 (2024).

We are likewise unpersuaded that, if Conway provided Scaplen with the name and birthdate he used for his BOPFI

---

[4] Counsel appear to have agreed on this procedure before trial as a way of ensuring that the jury did not hear evidence of the defendant's prior bad acts.

search, the search results would be inadmissible hearsay. Scaplen was available to testify about the name and date of birth he used in his BOPFI search, and no viable hearsay argument grows out of the fact that the source of this information was a nontestifying witness.[5]  See Commonwealth v. Randall, 50 Mass. App. Ct. 26, 27-28 (2000); Mass. G. Evid. § 801(c) (2024).  Contrast Encarnacion, 105 Mass. App. Ct. at 51 (testimony was hearsay where witness stated that, based on results of search run by another person, defendant was not licensed to carry firearms).

We reach a different conclusion as to the admission of exhibit 10, which Scaplen testified was a copy of the results of a separate BOPFI search that Conway ran.  Where Conway ran the search, did not testify at trial, and was not (so far as the record reveals) "unavailable" to testify, the results of the BOPFI search that she conducted should not have been admitted. See Encarnacion, 105 Mass. App. Ct. at 53-55.  Considering "the totality of the record before us," however, including that (1)

---

[5] In his brief, the defendant cites to Commonwealth v. Trotto, 487 Mass. 708, 731-732 (2021), to support his argument that, because Conway obtained the defendant's name and date of birth by conducting a "name search" of an unspecified database, the results of the search constituted testimonial hearsay.  The citation is unavailing, however, because there was no evidence that Conway obtained the defendant's name and date of birth through a database.

the defendant's identity as the shooter, and not his licensure, was "the premise of the defense," and (2) the result of Conway's search -- the single statement, "No Records Found" -- was identical to the result of the BOPFI search that Scaplen ran, we conclude that the error in admitting exhibit 10 was harmless beyond a reasonable doubt (citations omitted).  Id. at 53-55.

3.  Conditional relevance determination.  As we have noted, the jury heard evidence that, after the shooting, a Glock magazine was discovered in Pimental's home.[6]  The defendant had moved in limine to exclude that evidence as irrelevant, however. After a hearing, the judge concluded that the evidence was conditionally relevant and denied the motion on that basis.  The judge then instructed the jury that they could consider the evidence of the magazine if, and only if, they found beyond a reasonable doubt that the magazine was used in the shooting.

There was no abuse of discretion in the judge's handling of this conditional relevancy determination.  See Commonwealth v. Meola, 95 Mass. App. Ct. 303, 308-309 (2019).  "[T]he judge has a gatekeeper role, which requires the judge to assess the evidence and determine whether the jury or judge, acting as the fact finder, could find that the item in question is what its

---

[6] The police found the magazine in a safe belonging to Pimental's brother.

9

proponent claims it to be." Id. at 308. Here, the jury could have inferred, without engaging in improper speculation, that the magazine holding nine-millimeter bullets was used in the shooting on Pearl Street and was left by Pimental at his home several minutes afterward. Where the jury were properly instructed on their obligation to decide first whether "the magazine and the ammunition that were recovered from the apartment at 6 Hancock Street was the magazine that was inserted into a firearm that was alleged to be discharged on March 5th, 2022," and on their ability to consider the magazine as evidence "only . . . if [they] find, beyond a reasonable doubt, that it was the magazine that was in the firearm that was allegedly discharged on that date," the judge correctly addressed the conditional relevance question. See Meola, supra at 308-309. If, as we presume was the case, the jury did make those findings, then the magazine was one link in the chain of evidence connecting the defendant to the crimes with which he was charged, and so was relevant. See id. at 307.

4. Fingerprint analyst's testimony. The Commonwealth called State police Sergeant Gary Comeau, a member of the crime scene services section (CSSS), to testify about his role in photographing and "processing" the gray Nissan for fingerprints after the defendant's arrest. Comeau found three latent

10

fingerprint impressions in the front passenger seat area.  He

compared those latent prints to the defendant's known prints and

found "no conflicts."  He then developed an opinion that those

three impressions were "identified to" the defendant's known

prints.[7]

On cross-examination, defense counsel pressed Comeau about

whether investigative techniques other than fingerprinting,

including tests for the presence of gunshot residue, were

"typically" used in investigations of shooting crimes.  Comeau

demurred, testifying that "every situation is a little bit

different."  Explaining that the decision whether to include

additional scientific investigations "would vary [based] on the

severity" of the situation, he added, "[o]ftentimes, a

fingerprint identification stops that process because you have

[one hundred] percent of an identification completed."  Although

the defendant did not object to this testimony at trial, he

argues on appeal that it amounted to an improper opinion on

Comeau's level of certainty about his fingerprint

identifications.  See Commonwealth v. Gambora, 457 Mass. 715,

729 n.22 (2010) ("Testimony to the effect that a latent print

---

[7] Comeau was not asked on direct examination to testify to his opinion with any particular degree of certainty, and he did not do so.  He declined to use the term "match," and instead used "identification."

11

matches, or is 'individualized' to, a known print, if it is to be offered, should be presented as an opinion, not a fact, and opinions expressing absolute certainty about, or the infallibility of, an 'individualization' of a print should be avoided").

The challenged statement was not directly responsive to the question defense counsel asked; when Comeau made the statement, he was responding to a line of questioning designed to establish a Bowden defense about the investigators' failure to perform gunshot residue testing, not to challenge the reliability of his own fingerprint individualization opinion. See Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980). Additionally, on direct examination, Comeau expressed his individualization conclusions as an opinion, and did not express a level of certainty, much less "absolute certainty" or the "infallibility of" his opinions. See Gambora, 457 Mass. at 729 n.22. He stated only that he had "identified" the latent prints "to" the defendant's known prints.

Still, even reading Comeau's statement elicited on cross-examination as an impermissible opinion that he was one hundred percent certain about his fingerprint identification, see id. at 726 (recognizing "the need to prevent overstatement of the accuracy of fingerprint comparisons"), we discern no substantial

12

risk that justice miscarried because of its admission.  See Commonwealth v. Azar, 435 Mass. 675, 686 (2002), S.C., 444 Mass. 72 (2005) (unpreserved errors reviewed for substantial risk of a miscarriage of justice).  The jury saw video footage from the market showing the defendant as he left the front passenger's side of the gray Nissan, and they heard that the defendant was again in that seat when police stopped the gray Nissan later that day.  See Commonwealth v. Alphas, 430 Mass. 8, 23 (1999) (error must be serious when considered in terms of its injurious effect or influence on jury's verdict).  Accordingly, Comeau's testimony did no more than corroborate other, properly admitted evidence showing that the defendant had likely been in the front passenger's seat of the Nissan at some time before the car was processed.

Judgments affirmed.

By the Court (Hand, Grant & Wood, JJ.[8]),

Clerk

Entered:  June 30, 2025.

---

[8] The panelists are listed in order of seniority.

13