# Commonwealth *vs.* Vincent Wadlington.

Bristol. October 11, 2013. - February 14, 2014.

Present: Ireland, C.J., Cordy, Gants, Duffly, & Lenk, JJ.

*Homicide. Practice, Criminal,* Capital case, Voluntariness of statement, Admissions and confessions, Disclosure of evidence, Instructions to jury, Argument by prosecutor. *Evidence,* Admissions and confessions, Voluntariness of statement, Fingerprints, Expert opinion, Scientific test. *Constitutional Law,* Admissions and confessions, Voluntariness of statement, Waiver of constitutional rights, Search and seizure. *Search and Seizure,* Affidavit. *Armed Home Invasion. Armed Assault with Intent to Rob.*

A Superior Court judge, in denying a criminal defendant's pretrial motion to suppress statements that he made during a prearrest interview at the house of correction where he was being held, did not err in concluding that the defendant knowingly and voluntarily waived his Miranda rights until he invoked his right to silence during the interview, and that the defendant made those preinvocation statements voluntarily, despite having been given a misleading so-called "fifth" Miranda warning regarding his right to terminate questioning. [197-200]

A criminal defendant failed to demonstrate that the Commonwealth made a late disclosure of a witness's recanted statement, or that the defendant suffered prejudice thereby. [200-202]

A Superior Court judge did not err in denying a criminal defendant's pretrial motion to suppress fruits of a search of his girl friend's home, in which the defendant claimed that the search warrant relied in part on a statement that was later recanted, where the false statement had not been made by the affiant of the search warrant, and where, even without the recanted statement, there was ample other evidence in the affidavit to provide probable cause to search that location. [202-203]

There was no merit to a criminal defendant's argument that a fingerprint expert's opinion was inadmissible in the absence of a foundation demonstrating its statistical validity; further, under the circumstances, the admission of a statement that allegedly bolstered the expert's credibility did not create a substantial likelihood of a miscarriage of justice, particularly given the totality of inculpatory evidence at trial. [203-206]

At the trial of an indictment charging the defendant with armed robbery of two victims, the evidence, which showed a continuing course of conduct rather than clearly detached incidents, was sufficient to support a verdict of guilty [206], and no specific unanimity instruction was required [206-207].

At a criminal trial, nothing in the prosecutor's opening statement or closing argument created a substantial likelihood of a miscarriage of justice. [207]

At a criminal trial in which the defendant was convicted of murder in the first

degree on a theory of felony-murder, in which the Commonwealth alleged two predicate felonies, the absence of a specific unanimity instruction caused no prejudice to the defendant, who also was convicted on separate indictments of armed robbery and armed home invasion; further, the judge did not err in instructing the jury as a matter of law that the felonies in question were inherently dangerous to human life. [207-209]

INDICTMENTS found and returned in the Superior Court Department on March 3, 2006.

Pretrial motions to suppress evidence were heard by *Robert J. Kane*, J., and *Frances A. McIntyre*, J.; the cases were tried before *Richard T. Moses*, J., and a motion for a new trial, filed on October 4, 2011, was considered by him.

*Amy M. Belger* for the defendant.

*Eva M. Zelnick*, Assistant District Attorney, for the Commonwealth.

GANTS, J. A Superior Court jury convicted the defendant of the murder in the first degree of Rudolph Santos (victim) on the theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder, in violation of G. L. c. 265, § 1.[1] The defendant raises eight issues on appeal, claiming that (1) the motion judge erred in not suppressing all of the defendant's statements made during a prearrest interview at the house of correction where the defendant was being held; (2) the prosecutor failed timely to provide exculpatory evidence regarding a recanted statement made by William Fields, who was a joint venturer and key Commonwealth witness; (3) the fruits of a search of the defendant's girl friend's home should have been suppressed where the affidavit in support of the search warrant included information provided by Fields that Fields later recanted; (4) it was reversible error to allow the Commonwealth's fingerprint expert to testify that a latent fingerprint was made by the defendant, and to bolster her credibility by testifying that she "would never want to put an innocent person in jail"; (5) the trial judge erred in denying the defendant's motion for a

---

[1]The jury also convicted the defendant of the assault of Christopher Busby by means of a dangerous weapon (knife), in violation of G. L. c. 265, § 15B (*b*); armed robbery, in violation of G. L. c. 265, § 17; and armed home invasion, in violation of G. L. c. 265, § 18C. The jury found the defendant not guilty of assaulting Busby with the intent to murder.

required finding of not guilty as to the armed robbery charge where the Commonwealth failed to present sufficient evidence that property was taken; (6) the defendant's conviction of armed robbery must be vacated because the indictment identified two victims and the trial judge failed to instruct the jury that they must unanimously agree as to who was the victim; (7) a substantial likelihood of a miscarriage of justice arose from the prosecutor's improper statements during opening statement and closing argument; and (8) the defendant's conviction of felony-murder must be vacated because the judge failed to instruct the jury that they must unanimously agree on the predicate felony, and because the judge relieved the prosecution of its burden of proving a necessary element by instructing the jury that the crimes of armed robbery and home invasion are "inherently dangerous to human life as a matter of law."[2] For the reasons detailed below, we affirm the defendant's convictions and the denial of his motion for new trial, and after a complete review of the record, we decline to exercise our plenary authority under G. L. c. 278, § 33E, to order a new trial or to reduce the murder conviction to a lesser degree of guilt.

*Background.* We briefly summarize the evidence supporting the convictions, reserving certain details for our discussion of the alleged errors.

A few days before Christmas in 2005, Shannon Almeida was outside her home in New Bedford with Fields and Leslie Cole when the defendant (whom she knew only as "Blue") approached. She introduced the defendant to Fields and Cole because she knew that they were looking for a gun and that the defendant had one. On the evening of December 24, the defendant, Fields, and Cole, while at Almeida's home, devised a plan to rob a drug dealer's home. The men drove to Brockton, where the defendant retrieved a sawed-off rifle and some ammunition from an apartment, and returned to New Bedford, where they stopped at another house to obtain dark clothes to wear during

---

[2]The defendant also claims that his defense attorney provided ineffective assistance of counsel. Because his claim of ineffective assistance is based on defense counsel's failure to act appropriately to prevent some of the eight errors claimed on appeal or to preserve the defendant's rights regarding those alleged errors, we shall address this claim when we address the other claims.

the robbery. After returning to Almeida's home, they decided to "get this done" and traveled in Cole's automobile to an apartment in New Bedford where they knew drugs were sold.

On that Christmas eve night, Christopher Busby was at home in that apartment with the victim, who was his friend. Shortly before midnight, the defendant, Fields, and Cole approached the back door of the apartment, with the defendant carrying the firearm. The defendant knocked on the door, and when Busby asked him to identify himself, the defendant said that he was "Ed" and that they had "served him [one-]half hour ago." Busby said he did not recognize the name and told the defendant to step outside to the side window so he could see his face; the defendant handed the firearm to Cole and complied with the request. When the defendant knocked on the door again, Busby said he did not recognize him and was not selling any drugs. However, a few seconds later, Busby cracked open the door to see if "Ed" was still there, and when he did, the door was forced open and the three men rushed inside.

Cole wrestled with Busby and stabbed him with a knife, while Fields hit Busby with a steel pipe. The defendant fought with the victim. Shortly after the fighting began, Fields fled the scene, returned to Cole's automobile, drove to a nearby house where he knew the occupants, and told one of them to call the police because he heard gunshots.[3] Fields then drove the automobile back to where the three men had left it and fled on foot. Meanwhile, Busby was stabbed several times with a knife before collapsing and passing out. When he regained consciousness, he heard men demanding that the victim give them the keys to the cellar, where the drugs had been hidden. Busby retrieved his samurai sword and swung at the attackers, wounding Cole in the leg. The fight moved into Busby's bedroom, where Busby collapsed on his bed. Although Busby was unable to move, he was able to hear that the victim had surrendered the keys to the cellar. He then heard someone go down the cellar stairs and

---

[3]William Fields testified that he had not heard gunshots but told his acquaintance that he had in the hope that the acquaintance would notify the police, and that the police would quickly respond and stop the fighting. Fields testified pursuant to a plea agreement in which, in return for his testimony, the Commonwealth agreed to allow him to plead guilty to manslaughter and to receive a sentence of no less than nine and no more than ten years in State prison.

come back upstairs to ask, "Where is it? Where is it?" Busby then heard someone say, "It's only a .22," followed by a gunshot.

Shortly before 1 A.M., New Bedford police Officer Barry Pacheco and Sergeant Francisco Rodriques arrived at the scene and found the victim, who showed no signs of life, and Busby, who was lying on his bed covered in blood. A black sheath to a sword was lying next to Busby on the bed. Paramedics arrived shortly thereafter and found the victim dead, with a gunshot wound to the head, and Busby on his bed suffering from multiple puncture wounds.[4]

Later that night, Fields saw Cole with a bloody cloth wrapped around his leg. Two days later, Fields and Cole drove to the beach and threw a samurai sword and the clothes Cole had worn during the assault into the ocean.

Sergeant Kerri Gilpin of the State police processed the crime scene for fingerprint evidence. She cut out a piece of the cellar wall that had a "red-brown stain" that had tested presumptively positive for blood and found on it a latent impression of a partial palm print. She compared that latent palm print with the known palm print of the defendant and testified that, "in [her] opinion, the latent and the known print were made by the same donor."

Amy Joy, a chemist at the State police crime laboratory, generated a deoxyribonucleic acid (DNA) profile from a swab taken from a "red-brown drop" on the cellar stairs, and compared it with the known DNA profile of the defendant. She found that the DNA profile of the defendant "was consistent" with the DNA profile found on the cellar stairs, and that the probability of a randomly selected individual having that DNA profile is one in 3.782 quintillion of the African-American population.[5] Joy also compared the defendant's known DNA profile to the DNA profile on a swab taken from a red-brown stain on the interior rear driver's side door of Cole's automobile, and found them "consistent"; the probability of a randomly selected African-American having that same DNA profile is one in 3.782 quintillion.

---

[4]Busby survived and testified at trial to the attack, but did not identify the defendant or any of his assailants.

[5]The defendant is African-American.

During the defendant's interview on January 12, 2006, with State Trooper William R. Serpa, IV, and New Bedford police Detective Jason Gomes, the defendant denied any involvement in the killing and denied knowing Cole.[6] He claimed that he was at home with his girl friend, Janelle Morales, on the night of the killing, but Morales testified that she was at their home from 4 P.M. until she went to sleep around 3 A.M., and did not see the defendant there during that time period.

When he testified at trial, the defendant provided a different version of his whereabouts on the night of December 24, 2005, claiming that he was in Brockton delivering Christmas presents to his aunt and visiting his father in a nursing home, and that he returned home around midnight. He said he had never been in the residence where the killing occurred. He also said that he did not know Cole and had never been in his vehicle.

Following the jury's verdict, the defendant moved for a new trial, making the same claims that he now makes on appeal. The trial judge made factual findings as to the relevant disputed matters raised in the motion, and denied the motion in a written decision. The defendant appealed from the denial of his motion, which has been consolidated with his direct appeal.

*Discussion.* 1. *Motion to suppress the defendant's interview at the house of correction.* Before trial, the defendant moved to suppress the statements made by the defendant during the interviews conducted on January 12 and 13, 2006.[7] At the time of the interviews, the defendant was in custody on unrelated charges at the Plymouth County house of correction. After an evidentiary hearing, in which the motion judge (who was not the trial judge) heard testimony from Trooper Serpa and watched the video recording of the interviews, the judge suppressed the statements made by the defendant during the January 12 interview after the defendant asked, "Can I please leave without my lawyer being present?" but otherwise denied the motion.[8] The

---

[6]The interview was videotaped by State Trooper Joseph Silvia, IV. The judge allowed only an audiotape of portions of this interview to be played for the jury so that they would not see the defendant dressed in jail clothing or learn that he was in custody at the time of the interview.

[7]Only the January 12, 2006, interview is at issue on appeal.

[8]The motion judge concluded that the interview constituted a custodial

defendant contends that the entire interview should have been suppressed because the defendant was misinformed regarding the Miranda rights and did not make a knowing and intelligent waiver of his right to silence and to counsel. Based on our independent review of the videotaped interview and the documentary evidence, we conclude, as did the motion judge, that the defendant knowingly and voluntarily waived his Miranda rights until he invoked his right to silence during the interview, and that the preinvocation statements were made voluntarily.[9]

At the beginning of the interview, a correctional employee orally informed the defendant of the Miranda rights. In addition, the defendant was shown a consent form issued by the Plymouth County sheriff's department that included the Miranda warnings, as well as a so-called "fifth" Miranda warning, which is not required, regarding his right to terminate questioning. See *Commonwealth* v. *Novo*, 442 Mass. 262, 271 (2004), quoting *Commonwealth* v. *Silanskas*, 433 Mass. 678, 688 n.11 (2011) ("We do not require that the defendant be informed of his right to terminate questioning, a so-called 'fifth' Miranda warning"). However, the "fifth" Miranda warning in the written form did

___

interrogation within the meaning of *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966). The judge recognized that, where the police conduct an interview with a person who is in custody at a correctional facility, whether he is in custody for purposes of Miranda depends on "whether he is subject to some restraint in addition to those normally imposed on him by virtue of his status as an inmate." *Commonwealth* v. *Larkin*, 429 Mass. 426, 434 (1999). See *Commonwealth* v. *Perry*, 432 Mass. 214, 238 n.18 (2000), quoting *Commonwealth* v. *Larkin*, *supra* at 435 ("An additional restraint is one that places a restriction on the inmate's freedom of action in connection with the interrogation and prevents him from leaving the scene of questioning by placing a further limit on his already restricted freedom of movement"). The judge found that the defendant was subject to an additional restraint because a correctional employee who accompanied the defendant into the interview room urged him to "hear them out" and see what they had to say.

[9] "In general, 'in reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error "but conduct an independent review of his ultimate findings and conclusions of law." ' " *Commonwealth* v. *Clarke*, 461 Mass. 336, 340 (2012), quoting *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004). However, where, as here, the motion judge's findings of fact are based almost entirely on the videotape of the interview and a document in evidence, we stand in the same position as the motion judge and need not give deference to the judge's findings of fact. See *Commonwealth* v. *Clarke*, *supra* at 341, quoting *Commonwealth* v. *Prater*, 420 Mass. 569, 578 n.7 (1995).

not simply inform the reader that he could stop answering questions at any time; it provided, "If you decide to answer questions you may stop at any time to consult with a lawyer."[10] We criticized a similar "fifth" Miranda warning in *Commonwealth* v. *Novo, supra*:

> "[A]n ordinary person who hears the statement, 'you still have the right to stop the questioning at any time for the purpose of consulting an attorney' would not interpret it to mean that he can terminate questioning for any reason. Rather, the statement plainly implies that the *only* reason that a defendant may terminate questioning is to speak to an attorney" (emphasis in original).[11]

We declared in *Novo, supra*, that, "although a police officer is not *required* to give the fifth Miranda warning, if the officer gives the warning and gets it wrong, the incorrect statement of rights may affect the voluntariness of the defendant's confession" (emphasis in original).

After he was orally given the Miranda warnings and shown the consent form with the misleading "fifth" Miranda warning, the defendant was invited to sign the consent form to reflect that he had "not been coerced or otherwise forced into this meeting against [his] will." The defendant replied that he would agree to hear what they had to say but he would not agree to sign this part of the consent form. He agreed to sign the part of the form that admitted that he had been read the Miranda rights, but said he would not sign anything else. He added that he understood that he did not need to talk with the investigators, but said he wanted to know what was "going on." The trooper then said that they were investigating an "incident" that occurred late Christmas Eve or early Christmas morning, and asked where he was that night. The defendant described in detail the stores he visited on Christmas Eve and said he returned home later that evening, but periodically asked what allegedly had

---

[10]Trooper Serpa did not include this (or any) "fifth" Miranda warning when he orally informed the defendant of the Miranda rights.

[11]It is troubling that the Plymouth County sheriff's department in 2006 continued to include this misleading "fifth" Miranda warning in its consent form after our criticism of this warning in *Commonwealth* v. *Novo*, 442 Mass. 262, 271 (2004).

happened that evening and why they were interviewing him. The trooper cut him off, saying he would get to that later. In the first one-third of the interview, before he invoked his right to silence, the defendant said, "I don't want to get up and leave because I am trying to figure out what the Hell is going on."

We conclude, as did the motion judge, that the defendant knowingly and voluntarily consented to speak with the investigators because he hoped to learn what they were investigating. Later in the interview, when he learned why they were investigating him, he chose to continue the interview in an attempt to persuade them that he was innocent and had nothing to do with the armed robbery or the homicide. When it was apparent that he had not persuaded them, and after Trooper Serpa revealed that they had spoken with Morales and she had contradicted his claim that he was home with her late on Christmas Eve, the defendant invoked his right to silence.

While the language he used to invoke that right ("Can I please leave without my lawyer being present?") suggests that he read and recalled the "fifth" Miranda warning on the consent form, we are convinced beyond a reasonable doubt, as was the motion judge, that, despite this misleading warning, the defendant's statements were voluntary prior to the invocation. During the interview, the defendant declared that he understood his right to end the interview, saying, "One thing I do know. I am going to walk out of here; I am not worried about whatever you do to me." In fact, before his invocation of his right to silence, the defendant did walk out of the room and, shortly thereafter, after being heard crying in the hallway, returned to the interview to reiterate that he had nothing to hide and nothing to lie to them about.[12] Therefore, we conclude that no part of the redacted videotape of this interview that was admitted in evidence and shown to the jury at trial should have been suppressed by the motion judge.

2. *Commonwealth's disclosure of Fields's recanted statement.* When interviewed on January 11, 2006, by Trooper Scott A.

---

[12]We note that the defendant did not ask the judge to give a humane practice instruction at trial, and none was given. The defendant claims that the failure to do so constituted ineffective assistance of counsel, but we disagree, because the voluntariness of the defendant's statements was not a live issue at trial.

Flaherty, Trooper Serpa, and Detective Gomes, Fields said that, after formulating their plan on the evening of December 24, 2005, to commit the robbery, he, Cole, and the defendant traveled in Cole's automobile to a home on County Street in New Bedford that he believed was the residence of the defendant's girl friend. The defendant got out of the vehicle, entered the residence, and returned minutes later with a sawed-off rifle. However, on September 28, 2009, when Fields provided a proffer of his anticipated testimony to prosecutors, he stated that they had actually traveled to, and the defendant retrieved a firearm from, a residence in Brockton. The defendant argues that the Commonwealth failed to disclose this recanted statement, and that his attorney did not learn of it until either "the eve of trial or . . . the Commonwealth's opening statement."

The trial judge, however, found that a videotape recording of Fields's proffer statement was sent to defense counsel on October 23, 2009, and the judge's factual finding is not clearly erroneous. The prosecutor not only attested to having timely sent defense counsel a copy of the videotape recording, but after the defendant filed a motion for discovery regarding Fields, the prosecutor replied on March 23, 2010 (approximately six weeks before the commencement of trial), that defense counsel had previously received a copy of the recording of Fields's September 28 interview. Even if defense counsel failed timely to review the videotape and for that reason did not learn of Fields's recanted statement until the eve of trial, his failure did not render counsel ineffective because, as the judge found and the record reflects, he made "extensive and effective use of the prior inconsistency at trial in his cross-examination of Fields." "When dealing with a delayed disclosure of exculpatory evidence, 'it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant to make effective use of the evidence in preparing and presenting his case.' " *Commonwealth* v. *Smiledge*, 419 Mass. 156, 158-159 (1994), quoting *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980). Because Fields's statement was timely disclosed to the defendant, and the defendant was able effectively to use the information at trial on cross-examination

of Fields, we conclude that the defendant suffered no prejudice from his attorney's failure to learn of the recantation until the eve of trial.

3. *Motion to suppress fruits of search of girl friend's home.* Before trial, the defendant moved to suppress the fruits of the search of his girl friend's home on County Street in New Bedford, claiming that the affidavit in support of the search warrant failed to establish probable cause that evidence of the homicide would be found there. The affidavit in support of the search warrant included Fields's subsequently recanted statement that the defendant had retrieved a firearm from this home shortly before the planned armed robbery. The motion did not reference the recanted statement because it preceded the recantation; the motion judge (who was neither the trial judge nor the judge who ruled on the motion to suppress statements) denied the motion to suppress two days before Fields recanted the statement in making his proffer. The defendant did not move for reconsideration after learning of the recantation, but argued in his motion for new trial that defense counsel was ineffective for failing to do so. He now claims that his constitutional rights were violated because the affidavit in support of the search warrant relied in part on the recanted information.

Whether characterized as ineffective assistance of counsel or as a violation of constitutional protections against illegal search and seizure, the defendant's claim fails for two reasons. First, the false statement was made by Fields, not by the affiant of the search warrant affidavit. The defendant does not claim (nor is there evidence to support a claim) that the affiant knew when he attested to the affidavit that the defendant had retrieved the firearm from a home in Brockton rather than his girl friend's home in New Bedford, or that the affiant had any reason to doubt the accuracy of Fields's statement. Where Fields was implicating himself in a homicide and was providing information based on personal knowledge, the affiant appropriately used this information in support of his application for a search warrant, and the judge appropriately could consider it in evaluating probable cause. The fact that the information was unexpectedly later revealed to be false does not affect either the integrity of the search warrant application or the finding of probable

cause. See *Commonwealth* v. *Nine Hundred & Ninety-Two Dollars*, 383 Mass. 764, 774-775 (1981) (although affidavit in support of search warrant included factual errors provided by informants, no hearing required pursuant to *Franks* v. *Delaware*, 438 U.S. 154, 155-156 [1978], where defendant did not allege affiant knew statements were false or show that affiant had reason to doubt their truth). Contrast *Commonwealth* v. *Corriveau*, 396 Mass. 319, 334 (1985), quoting *Franks, supra* (search warrant must be voided where affiant made false statement in affidavit knowingly and intentionally, or with reckless disregard for truth, and where false statement was necessary to finding of probable cause).

Second, as the judge stated in his decision in denying the motion for new trial, even without any evidence of the defendant having retrieved a firearm from his girl friend's residence, there was ample other evidence in the search warrant affidavit to provide probable cause that the defendant resided there. Another named witness told the affiant that she knew that the defendant lived on County Street and knew his cellular telephone number. When she dialed the number, the woman who answered identified the defendant as her boy friend, said that he was currently incarcerated at the Plymouth County house of correction, and provided his true name. Trooper Serpa confirmed that the defendant was in custody there, and confirmed his address on County Street from records of the board of probation and the New Bedford police department. Later, when a trooper went to secure the residence, he saw the defendant's name on the mailbox and confirmed with the defendant's girl friend's babysitter that the defendant resided at the apartment. Consequently, without the false information provided by Fields, there was more than probable cause to believe that the defendant resided (until his incarceration) at the apartment that was searched, and that a search of the defendant's apartment would yield evidence of the homicide.

Therefore, even had the defendant timely moved to reconsider the denial of his motion to suppress, the motion properly would have been denied, because the subsequent recantation did not affect the finding of probable cause.

4. *Testimony of the fingerprint expert.* Before offering her

opinion, the Commonwealth's fingerprint expert, Sergeant Gilpin, testified as to her training and experience in the field of fingerprint analysis, and generally about the analysis, comparison, evaluation, and verification (ACE-V) methodology of identifying fingerprints. In describing the evaluation phase, she stated, "If, in my opinion, based on my training and experience, each of the ridge characteristics are in the same location and the same spatial relationship to one another from the latent to the known, then, in my opinion, I would say that the latent and the inked impression were made by the same donor." As noted earlier, when asked later in her testimony about her evaluation of the latent impression of a partial palm print found on the cellar wall, she declared that "in [her] opinion, the latent and the known print [of the defendant] were made by the same donor." The defendant objected to Sergeant Gilpin offering an opinion based on this methodology, and argues on appeal that her opinion was inadmissible because she failed to provide a foundation demonstrating its statistical validity akin to that provided when an opinion is offered regarding DNA evidence.

In *Commonwealth* v. *Patterson*, 445 Mass. 626, 628 (2005), we concluded that "the underlying theory and process of latent fingerprint identification, and the ACE-V method in particular, are sufficiently reliable to admit expert opinion testimony regarding the matching of a latent impression with a full fingerprint." We did not depart from that conclusion in *Commonwealth* v. *Gambora*, 457 Mass. 715, 727-728, 729 n.22 (2010), but warned that "[t]estimony to the effect that a print matches, or is 'individualized' to, a known print . . . should be presented as an opinion, not a fact, and opinions expressing absolute certainty about, or the infallibility of, an 'individualization' of a print should be avoided." *Id.* at 729 n.22. Cf. *Commonwealth* v. *Pytou Heang*, 458 Mass. 827, 848-849 (2011) (ballistics experts may offer opinion that particular firearm fired projectile or cartridge casing recovered as evidence to "reasonable degree of ballistic certainty," but "[p]hrases that could give the jury an impression of greater certainty . . . should be avoided").

If we were to require that a foundation be laid demonstrating the statistical validity of fingerprint identification before admitting such an opinion, we effectively would be declaring finger-

print identification opinions inadmissible because their statistical validity cannot yet be proved. See National Research Council, Strengthening Forensic Science in the United States, A Path Forward 136, 139 (2009) (NAS report) (because, among other reasons, ACE-V methodology "does not allow one to stipulate specific measurements in advance, as is done for a DNA analysis . . . population statistics for fingerprints have not been developed, and friction ridge analysis relies on subjective judgments by the examiner"). See also *Commonwealth* v. *Joyner*, *ante* 176, 186 n.12 (2014) (describing research regarding statistical validity of fingerprint identification). We did not bar the admission of fingerprint identification opinions in our *Gambora* opinion, which discussed the NAS report at length, and we do not do so here. See *Joyner*, *supra* at 184, quoting *Commonwealth* v. *Beausoleil*, 397 Mass. 206, 218 n.15 (1986) ("Although we have recognized the 'necessarily probabilistic' nature of fingerprint identification evidence, we have not required the Commonwealth to provide accompanying statistical information like that sought by the defendant"); *Commonwealth* v. *Gambora*, 457 Mass. at 724-728.

Sergeant Gilpin's testimony at trial preceded the issuance of our *Gambora* opinion, and therefore she did not have the benefit of the guidelines we established governing fingerprint identification testimony. In her direct examination, she made clear that she was offering her opinion regarding identification, rather than stating a fact, but on cross-examination, when asked whether she believed that there was "no error rate in [her] area of science," she answered, "If a fingerprint examiner trained in competency follows the scientific methodology of ACE-V, then the error rate should be zero." While it would be error for the Commonwealth to have elicited such testimony, the judge did not err in allowing it under these circumstances where it was elicited by defense counsel, and where there was no motion to strike.[13]

Later on cross-examination, after Sergeant Gilpin testified that she reaches an opinion regarding fingerprint identification

---

[13]We note that Sergeant Gilpin also testified on cross-examination that fingerprint opinions are arrived at by "experience and training," and "there's not 100 percent accuracy in any . . . science."

based on the "totality of the information," defense counsel asked how many matching "lines" of friction ridges she needed to find before she could form an opinion. The questioning proceeded as follows:

> DEFENSE COUNSEL: "How about eight lines?"
>
> THE WITNESS: "Again, it would depend on the totality of the information."
>
> DEFENSE COUNSEL: "And, as you said, you personally would not do it?"
>
> THE WITNESS: "I wouldn't feel comfortable with that, and I would never want to put an innocent person in jail."

The latter phrase should have been struck, but there was no motion to strike, and its admission under the circumstances, particularly given the totality of the inculpatory evidence, did not create a substantial likelihood of a miscarriage of justice.

5. *Sufficiency of the evidence of armed robbery.* We need not dwell on the defendant's claim that the trial judge erred in denying the defendant's motion for a required finding of not guilty as to the armed robbery charge. There was more than sufficient evidence that the defendant and his joint venturers were armed when they entered the targeted residence, that their purpose was to rob the occupants of drugs and money, and that, at a minimum, they stole a samurai sword during the course of the robbery.

6. *Absence of specific unanimity instruction regarding the armed robbery indictment.* The defendant argues that, where the indictment charging armed robbery identified both Busby and Santos as victims, the judge erred in failing to give a specific unanimity instruction because the jurors may have differed as to which one was robbed. The defendant, however, did not request a specific unanimity instruction or object to its absence. We find no error and, therefore, no substantial likelihood of a miscarriage of justice. Here, both Busby and Santos were properly identified as victims of the armed robbery in the indictment because each had "some protective concern with respect to the

property taken," and the property was taken from both victims' "person or presence." *Commonwealth* v. *Levia,* 385 Mass. 345, 351 (1982). See *Commonwealth* v. *Stewart,* 365 Mass. 99, 108 (1974). No specific unanimity instruction was required because the evidence showed "a continuing course of conduct" during the robbery rather than "clearly detached incidents," *Commonwealth* v. *Santos,* 440 Mass. 281, 285 (2003), overruled on other grounds by *Commonwealth* v. *Anderson,* 461 Mass. 616, 633 (2012), quoting *Commonwealth* v. *Thatch,* 39 Mass. App. Ct. 904, 905 (1995), with significant "spatial and temporal separations between acts." *Id.*

7. *The prosecutor's statements during opening statement and closing argument.* The defendant claims that the prosecutor made various improper statements in her opening statement and closing argument where she misstated the evidence, improperly appealed to jurors' sympathy, and shifted to the defendant the burden to prove his innocence. The defendant did not object at trial to either the prosecutor's opening statement or her closing argument, and correctly so, because we have reviewed both and found no improper statements. Nothing in the prosecutor's opening statement or closing argument created a substantial likelihood of a miscarriage of justice.

8. *Conviction of murder on the theory of felony-murder.* The defendant contends that his conviction of murder in the first degree on the theory of felony-murder must be vacated because the judge told the jury that the Commonwealth must prove beyond a reasonable doubt that the defendant "committed or attempted to commit the offense of armed robbery and/or armed home invasion," but did not instruct the jury that they must be unanimous as to the underlying felony. The defendant at trial did not request such an instruction or object to its absence. We agree with the defendant that he was entitled to a specific unanimity instruction where the Commonwealth alleged two predicate felonies. The Supreme Judicial Court's Model Jury Instructions on Homicide 17 (1999), in effect at the time of trial, provided, "For cases in which more than one felony is alleged, the jurors must be instructed that they must be unanimous with regard to the underlying felony in order to return a verdict of guilty of

felony-murder in the first degree.''[14] Where a required element of felony-murder in the first degree is that the defendant committed or attempted to commit a felony with a maximum sentence of imprisonment for life, see *id.* at 15, the jury must agree as to the felony committed, even if each of the alternative underlying felonies are life felonies.

The absence of such an instruction here, however, caused no prejudice to the defendant, because the defendant was convicted on separate indictments charging armed robbery and armed home invasion, so we know that the jury unanimously found beyond a reasonable doubt that the defendant committed both of these felonies. Moreover, even if the conviction on this theory of murder in the first degree were to be vacated, the conviction of murder in the first degree would still stand, because the defendant was also convicted of this crime on the theories of deliberate premeditation and extreme atrocity or cruelty.[15]

The defendant also contends that the judge erred in instructing the jury as a matter of law that the felonies of armed home invasion and armed robbery are "inherently dangerous to human life," claiming that, in doing so, the judge relieved the prosecution from its burden of proving this required element of the offense of felony-murder. The judge's instruction was correct; "[i]t is not the province of the jury to determine whether a felony is inherently dangerous." *Commonwealth* v. *Scott*, 428 Mass. 362, 364 (1998). See *Commonwealth* v. *Tevlin*, 433 Mass. 305, 313-314 (2001), quoting *Scott, supra* (prosecution does not need to prove defendant acted with conscious disregard for human life where felony is "inherently dangerous" because risk is implicit in intent required for any "inherently dangerous" felony). See generally Model Jury Instructions on Homicide 17 (1999). Armed robbery and armed home invasion are among

---

[14]The model jury instructions on homicide in effect today include a similar instruction. Model Jury Instructions on Homicide 52 (2013) ("If more than one felony is alleged, the jury must be instructed that they must be unanimous with regard to the underlying felony in order to return a verdict of guilty of felony-murder in the first degree").

[15]For this reason, neither the conviction of armed robbery nor the conviction of armed home invasion need be vacated as lesser included offenses of the conviction of murder in the first degree. See *Commonwealth* v. *Felder*, 455 Mass. 359, 370-371 (2009), quoting *Commonwealth* v. *Brum*, 441 Mass. 199, 200 n.1 (2004).

those felonies we have deemed to be "inherently dangerous to human life" as a matter of law. See *Commonwealth* v. *Cannon*, 449 Mass. 462, 471 (2007) ("The law in this regard is clear: murder in the attempted commission of an armed robbery is adequate to support a conviction of murder in the first degree under a theory of felony-murder"); *Commonwealth* v. *Bourgeois*, 404 Mass. 61, 64 (1989) (armed robbery); *Commonwealth* v. *Doucette*, 430 Mass. 461, 468 n.6 (1999) (armed home invasion).

9. *Review under G. L. c. 278, § 33E.* We have examined the record pursuant to G. L. c. 278, § 33E, and discern no basis to exercise our authority to set aside or reduce the verdict of murder in the first degree. The defendant was ably and fairly tried and convicted.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*