NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13134


COMMONWEALTH  vs.  GLENN R. ARMSTRONG.



Worcester.     April 10, 2023. - June 30, 2023.

Present:  Budd, C.J., Gaziano, Cypher, Kafker, & Wendlandt, JJ.


Homicide.  Constitutional Law, Admissions and confessions,
     Voluntariness of statement, Waiver of constitutional
     rights.  Evidence, Admissions and confessions,
     Voluntariness of statement, Fingerprints, Expert opinion.
     Search and Seizure, Threshold police inquiry.  Threshold
     Police Inquiry.  Mental Impairment.  Practice, Criminal,
     Capital case, Motion to suppress, Admissions and
     confessions, Voluntariness of statement, Waiver,
     Instructions to jury.  Witness, Expert.




     Indictments found and returned in the Superior Court
Department on June 13, 2017.

     A pretrial motion to suppress evidence was heard by Shannon
Frison, J., and the cases were tried before Daniel M. Wrenn, J.


     Sean M. Smith for the defendant.
     Danielle E. Borges, Assistant District Attorney, for the
Commonwealth.


     WENDLANDT, J.  The defendant, Glenn Armstrong, was

convicted of murder in the first degree on the theories of

deliberate premeditation and extreme atrocity or cruelty in connection with the January 2017 killing of his eighty-three year old father, Walter Armstrong.[1] The victim was found dead in his Blackstone home. He had suffered multiple blows to his head and torso, and six of his ribs were fractured. A plastic garbage bag had been placed over his head, apparently while he was still alive, and then tied tightly around his neck with a belt. A medical examiner would later opine that the cause of death was blunt force injuries of the head and torso and asphyxia by ligature strangulation. There were no signs of forced entry, and the defendant's belongings were in the home, as was the sideview mirror of the victim's truck, although the truck was missing. Earlier that day, before the discovery of the victim's body, the defendant, who had been estranged from his father for decades before reestablishing a connection that year, had arrived at his brother-in-law's home searching for adhesive to reattach the truck's sideview mirror; he left a handwritten note, stating, "DAds iN A Betta Mood Now." The defendant would later be found in New Jersey along with the victim's truck, which was missing its sideview mirror.

In this direct appeal, the defendant maintains that the motion judge erred in denying his motion to suppress evidence

---

[1] The defendant was also convicted of larceny of a motor vehicle, in violation of G. L. c. 266, § 28 (a).

from the New Jersey police officers who arrested him, that the trial judge erred in denying his request for a jury instruction on mental impairment, and that testimony by the Commonwealth's fingerprint analysis expert opining that fingerprints found on the bag covering the victim's body matched the defendant's was improper. He also asks the court to exercise its authority under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial. We affirm the convictions and discern no reason to grant relief under G. L. c. 278, § 33E.

1. <u>Background</u>. a. <u>Facts</u>. The following facts are supported by the evidence presented at trial.

i. <u>Discovery of the victim</u>. The defendant and the victim, his eighty-three year old father, had been estranged for approximately two decades. They had reconnected after the death of the defendant's mother -- the victim's wife -- in 2016.

Approximately nine months later, on January 11, 2017, a Blackstone police officer arrived at the victim's Blackstone home at about 5 <u>P</u>.<u>M</u>. to conduct a welfare check;[2] no one answered

---

[2] Earlier that morning, at about 10:45 <u>A</u>.<u>M</u>., a "Meals on Wheels" delivery driver had arrived at the victim's home, but the victim had not answered the door and his truck was not in the carport. The driver observed that the television in the living room was on and saw a man's shoe in the middle of the floor; the driver informed her supervisor, and ultimately the Blackstone police department was asked to conduct a welfare check.

the door, and the victim's truck was not in the carport.[3]  There

were no signs of forced entry; the doors to the house were

locked, and the windows were secured.[4]

The police officer radioed dispatch to ask for assistance

in gaining entry to the home.  The defendant's sister and

brother-in-law arrived; the sister had a key to a sliding door

in the carport, but not to the screen in front of it, which the

officer cut through.  They entered the house and ultimately

found the victim dead on the floor of one of the bedrooms.

A black garbage bag covered the victim's head and was

secured tightly with a belt around his neck.  In the opinion of

the Commonwealth's expert on fingerprint analysis, latent

fingerprints found on the bag and on a roll of bags in the

basement matched the defendant's fingerprints.[5]  Next to the

victim were his wallet, which did not appear to be missing any

---

[3] The television, which had been on earlier that morning, see note 2, supra, was still on.

[4] There were three doors to the house.  Two were locked from the inside -- only the front door could have been locked and deadbolted from the outside.  Given that there was no sign of forced entry, the Commonwealth's theory was that the killer could have left through the front door and then locked it from the outside with the key.  As discussed infra, when the defendant was later found in New Jersey, he had two keys for the front door -- one had belonged to the victim, and the other had belonged to the defendant's mother.

[5] The expert based this opinion on the "analysis, comparison, evaluation, and verification" (ACE-V) framework, as discussed infra.

items, and a receipt from the prior day for an order, including a medium sized drink, from a quick serve food establishment in Woonsocket, Rhode Island.  In the hallway in front of the doorway was a red-brown stain of the victim's blood.

On the kitchen table lay the victim's glasses[6] and a sideview mirror from the victim's truck.[7]  Near the kitchen sink was a cup bearing a logo from the same quick serve food establishment as shown on the receipt.  In the basement were the defendant's leather jacket, identification card, and cell phone. These items were found next to a couch that appeared slept-in; the defendant had been evicted recently from his own home.  Near the belongings was the roll of black garbage bags.

A medical examiner performed an autopsy on the victim. Inside the garbage bag, she found almost three cups of blood. There was a ligature furrow, three centimeters wide, around the victim's neck.  The victim had multiple bruises on his arms and torso, bruises and lacerations on his face and hands, swelling and bruising of the left ear, hemorrhages of the conjunctivae of his eyes, and six fractured ribs.  The medical examiner opined that the victim was alive when the bag was placed over his head. She explained that strangulation occludes part of the blood

---

[6] After the death of his wife, the victim had been sleeping on a couch in the adjacent living room.

[7] Two bent venetian blinds were the only sign of a struggle.

flow, increasing the blood pressure in the capillaries in the face, resulting in ruptured capillaries and pinpoint hemorrhages, which the victim had.  These hemorrhages would not have occurred if the victim had not been alive while he was being strangled.  She opined that the cause of death was blunt force injuries of the head and torso and asphyxia by ligature strangulation.  The defendant's deoxyribonucleic acid (DNA) was not found on the victim, nor was the victim's DNA found on the defendant.

    ii.  <u>Events prior to discovery of the victim's body</u>.  Two days before the victim's body was found, the defendant was without a vehicle -- his own truck was being repaired by his brother-in-law and his rental car was in an impound lot.  He wore the leather jacket and a lanyard with the identification card -- items that would be found later in the victim's home -- when the defendant and his brother-in-law tried and failed to retrieve the rental vehicle.  The victim had refused to drive the defendant to the impound lot, but gave him a ride to a storage facility in his truck.[8]  The victim generally did not allow others to drive his truck, and at least once, the

---

[8] The defendant showed an employee of the storage facility his identification card and told her that he was "homeless."

defendant had asked to borrow the victim's truck, but the victim had refused.[9]

On the morning of the day before the victim's body was found, his truck was in its usual place in the carport of the Blackstone home.[10] The truck had no visible damage. The victim happily greeted a delivery driver from "Meals on Wheels," engaging in "light-hearted banter."[11] That afternoon was the last time the victim was seen alive; he had arrived at a business in Woonsocket, Rhode Island, looking for the defendant.[12] During that same afternoon, the defendant initially had called his brother-in-law to ask to be picked up from a quick serve food establishment in Woonsocket, but later informed his brother-in-law that he no longer needed assistance because the victim had given him a ride in his truck. As discussed supra, a receipt and cup from this establishment would later be found in the victim's home when his body was discovered.

---

[9] A witness for the defense, a friend of the defendant, testified that once, in 2016, the defendant borrowed the victim's truck.

[10] The victim generally parked his truck in the carport of his home and did not drive at night due to his limited vision.

[11] Following the death of his wife, the defendant's mother, the victim had been receiving food deliveries from "Meals on Wheels."

[12] The defendant had lived in Woonsocket, which is just south of Blackstone, prior to being evicted from his home.

At approximately 3 A.M. and 5 A.M. on January 11, 2017, the day the victim's body was found, the defendant left voice messages for the car rental company.  In the second message, he told the company that he no longer needed a vehicle.

At around 9:30 A.M., the defendant drove the victim's truck to his brother-in-law's garage, looking for adhesive to reattach the sideview mirror.  The brother-in-law was not there.[13]  The defendant entered the garage, carrying a brown paper bag, and then left.

Later that day, the brother-in-law found a note written on a paper bag in the defendant's handwriting, left on his work bench, reading "THNX 4 The Donut Bro."  The brother-in-law would later find a second note, also written in the defendant's handwriting on a piece of a brown paper bag, reading "DAds iN A Betta Mood Now."  Neither note had been in the garage before that morning.

iii.  New Jersey events.  The day after the victim's body was found, two police officers from Mount Laurel, New Jersey, Mark Ricigliano and Alan Levy, were dispatched to a motel to respond to "a trespassing-suspicious persons complaint."  Ricigliano encountered the defendant in the lobby bathroom and walked with him to the motel's parking lot, where the defendant

---

[13] The brother-in-law's coworker was present and testified as to his observations of the defendant that morning.

had left the victim's truck.  The truck was missing its sideview mirror.  The defendant was disheveled, wearing shorts and unlaced boots, and had abrasions and scratches on his face and legs.  He refused to share his name with the officers.  He told the officers that he had been robbed of his cell phone[14] and wallet; he reported that he was stranded, having run out of gasoline while on his way to the Department of the Interior, where he claimed he worked an unpaid job.[15]  Ricigliano testified that the defendant was "just kind of strange" and was confrontational and "aggressive at times."  Levy added that the defendant "was just speaking things that didn't make much sense . . . and just kind of irrational, and just like something was going on."

Ricigliano conducted a registration query of the truck and learned that it was registered to the victim; he also learned that "Glenn Armstrong" was wanted for questioning in a murder investigation.  Ricigliano called the defendant by his first name; when the defendant acknowledged him, the defendant was placed under arrest.

---

[14] As set forth supra, the defendant's cell phone was found in the victim's basement the day prior, when the victim's body had been found.

[15] Ricigliano offered to make a telephone call for the defendant.

From the glove box of the truck, officers recovered a set of keys on a keychain with the name "Walter" and a label "front" -- the victim's keys to the front door of his house.  Another set of keys to the front door of the victim's house were recovered; these were labeled with the name of the defendant's mother.  Later, while officers attempted to read the defendant the Miranda rights, he repeatedly interrupted them, including to ask them whether the victim had reported the truck stolen and to tell them that he had been evicted; that he had ripped the sideview mirror off the victim's truck; that he subsequently had awakened his father, who appeared "grouchy"; and that he had stolen the truck to get it fixed at his brother-in-law's garage.

b.  Procedural history.  The defendant was indicted in June 2017 on one count of murder in the first degree, in violation of G. L. c. 265, § 1, and one count of larceny of a motor vehicle, in violation of G. L. c. 266, § 28 (a).  The defendant filed a motion to suppress evidence from the New Jersey encounter, which was denied after an evidentiary hearing.

A jury trial was held in May 2019.  The jury found the defendant guilty of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty.

The defendant was sentenced to life without parole.[16]  He filed a timely notice of appeal.

2.  _Discussion_.  In this direct appeal, the defendant raises several issues, which we address in turn.

a.  _Motion to suppress_.  The defendant contends that the motion judge erred in denying his motion to suppress evidence obtained by the New Jersey police officers, arguing for the first time on appeal that he was subject to custodial interrogation without being provided with Miranda warnings.[17] The Commonwealth asserts that, because the interaction was within the scope of the community caretaking function, there was no custodial interrogation and Miranda warnings were not required.  "In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings absent clear error but conduct an independent review of [the] ultimate findings and

---

[16] The jury also found the defendant guilty of larceny of a motor vehicle, and the defendant was sentenced to a term of from two years to three years in State prison, concurrent with his life sentence.

[17] In his motion to suppress, the defendant argued that he was illegally seized prior to the point at which the New Jersey police officers learned of the outstanding arrest warrant in connection with the victim's killing; he did not raise an argument related to an alleged failure to provide him with Miranda warnings.  Similarly, at trial, the defendant renewed his "motion to suppress the _Terry_ stop," but again did not contend that there was a Miranda rights violation.  The renewed motion was denied on the same grounds as was his motion to suppress.

conclusions of law" (quotations and citation omitted).

Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

i. Background. We recite the facts found by the motion judge.[18]

Ricigliano and Levy "received a call for a person who would not leave . . . [a m]otel"; upon arriving at the motel, Ricigliano spoke with employees at the front desk, who told him "that a man who was not a guest had been in and out of the building most of the night, and that they were concerned about his appearance and demeanor." The employees "wanted [the officers] to check on [the defendant] and make sure he was okay." A desk clerk stated that the defendant "made her feel uncomfortable."[19]

Ricigliano knocked on the door of the motel lobby bathroom, and the defendant emerged, left the lobby area, and departed

---

[18] We also supplement the motion judge's subsidiary findings with "evidence from the record that 'is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony.'" Jones-Pannell, 472 Mass. at 431, quoting Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008). We "do so only so long as the supplemented facts 'do not detract from the judge's ultimate findings.'" Jones-Pannell, supra, quoting Commonwealth v. Jessup, 471 Mass. 121, 127-128 (2015).

[19] Levy testified as to the "normal protocol" in these situations; he stated that this "standard operating procedure" was intended to "make the complainant feel good that . . . we identified this person . . . [and] they're not wanted, they're not missing [or] endangered, [and] . . . they're not a [National Crime Information Center] hit."

from the motel into the adjacent parking lot.  Ricigliano
followed him.  Ricigliano explained that the defendant "was
reluctant to give his name to the officer, but [he] stated that
he had lost his wallet (and money) and had run out of
gas[oline]."  It was winter; the defendant was wearing shorts,
and his work boots were unlaced.  He "was argumentative at
times, [and] said that he worked for the Department of the
Interior and [was] on his way back to Washington[,] D.C. (though
he said he did not get paid from that job)."

Ricigliano noted that "the defendant's emotions seemed to
fluctuate during their conversation."  He thought the defendant
"might be lost, disoriented, or a missing person."[20]  Ricigliano

---

[20] Ricigliano testified that they "were trying to figure out
who [the defendant] was and how [they] could help him"; their
"main concern was that he may have been -- just by the way he
was acting -- he may have been an emotionally disturbed person
that may have been entered missing or endangered and [they]
were, at that point in time[,] concerned for his well-being to
see if, you know, what [they] could do to assist him."  He
further testified:

> "[W]e asked him, obviously, what was going on, why you were
> there.  And just his answers -- his evasiveness about who
> he was kind of makes you, you know, maybe [think] there's
> something going on.  Maybe he doesn't know who he is.  So
> out of concern for his well-being, and just trying to see
> if he needs some type of help, he said he was stranded
> there.  We dug a little more to, you know . . . -- like I
> said, sometimes people leave their house and they're
> reported missing because they have mental problems, or
> issues, or whatever.  And they're, you know, we were just
> concerned that he may have been, you know, ha[ving] an

"directed the defendant to sit down near [the victim's] truck at one point because he was becoming agitated and irrational."[21] Ricigliano then entered the truck's license plate number into his mobile data terminal and learned of an arrest warrant for an individual named "Glenn Armstrong"; when the defendant responded to the name "Glenn," Ricigliano placed the defendant under arrest.[22] The interaction lasted approximately twenty minutes, from when Ricigliano arrived on the scene to when he arrested the defendant.[23]

ii. <u>Analysis</u>. Law enforcement officers sometimes are called upon to engage in duties "in which there is no claim of

---

issue and he left the house and he -- so, you never know. There's a thousand things that it could be."

Levy testified that he and Ricigliano were trying to "maybe help get [the defendant] some gas[oline]" and "maybe even possibly get[] him medical treatment if he needed."

[21] When asked whether the order was made in "a command voice," Ricigliano answered, "We pressed him to sit down, yes." Additionally, Levy explained that he was concerned that the defendant may have been missing, wanted, or a danger to himself or others.

[22] Levy testified that, until they learned of the warrant, they were "trying to find ways to help" the defendant.

[23] An audio recording of the interaction was introduced at trial; this recording was not presented during the motion hearing, nor was it before the trial judge when he denied the renewed motion. Nonetheless, we have reviewed the audio-visual footage independently, see <u>Commonwealth</u> v. <u>Yusuf</u>, 488 Mass. 379, 380-381 (2021), in connection with our review pursuant to G. L. c. 278, § 33E.

criminal liability," such as the officers' "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 441 (1973). Under the community caretaking function, "an officer may, when the need arises, stop individuals and inquire about their well-being, even if there are no grounds to suspect that criminal activity is afoot." Commonwealth v. Knowles, 451 Mass. 91, 94-95 (2008). See id. at 95 ("An officer may take steps that are reasonable and consistent with the purpose of his [community caretaking] inquiry, . . . even if those steps include actions that might otherwise be constitutionally intrusive").

But "[a] noncoercive inquiry initiated for a community caretaking purpose may ripen into a seizure requiring constitutional justification." Commonwealth v. Mateo-German, 453 Mass. 838, 842 (2009). See id. ("A check by a police officer . . . falls within the scope of the community caretaking function when its purpose is to protect the well-being of the [individual] and the public -- and not when the purpose is the detection or investigation of possible criminal activity"). See, e.g., Commonwealth v. Eckert, 431 Mass. 591, 595-596 (2000) (well-being check ripened into seizure when officer asked defendant to get out of vehicle and perform field sobriety tests

such that "it was reasonable for the defendant to conclude that he was no longer free to leave and that his cooperation with the trooper's investigation was no longer voluntary").

Here, the record shows that the New Jersey officers had "an objectively reasonable basis for believing that the safety of an individual or the public [was] jeopardized," and their actions stayed within their community caretaking function. Commonwealth v. Gonsalves, 445 Mass. 1, 9-10 (2005), abrogated on other grounds as recognized by Commonwealth v. Rand, 487 Mass. 811, 825 n.14 (2021), quoting Commonwealth v. Brinson, 440 Mass. 609, 615 (2003). The officers' noncoercive inquiries centered on the well-being of the defendant, who appeared to be stranded, away from his home, without a cell phone, a wallet, or gasoline for the truck, and ill-dressed for the winter day. Moreover, the defendant refused to identify himself and also exhibited behaviors indicating that he was disoriented or potentially experiencing a mental health crisis.

The officers' actions and questions did not stray into a custodial investigation of criminal conduct; indeed, at the time they were questioning the defendant, they were unaware that he was wanted in connection with the victim's killing. Cf. Knowles, 451 Mass. at 95-96 (community caretaking function not implicated where "objective view of the actions of the officer leads to the conclusion that he was in fact conducting a

criminal investigation," motivated by search for evidence, rather than caretaking). In these circumstances, the officers' attempts, including temporarily detaining the defendant, to ascertain the defendant's identity and to ensure he was not missing or wanted were reasonable. See id. at 95 ("under community caretaking doctrine, officers may, without reasonable suspicion of criminal activity, approach and detain citizens for community caretaking purposes"). See, e.g., Commonwealth v. Evans, 436 Mass. 369, 376 (2002) ("This request for the defendant's license and registration was a minimal intrusion on the defendant's rights, outweighed by the trooper's responsibility to protect the public, through the community caretaking function, from a driver who may be unfit to continue driving").

Because the officers' conduct did not ripen into a custodial investigation of criminal activity, the officers were not required to give Miranda warnings to the defendant. See Commonwealth v. Kirwan, 448 Mass. 304, 309 (2007), quoting Commonwealth v. Jung, 420 Mass. 675, 688 (1995) ("Miranda warnings are only necessary for 'custodial interrogations'"). See also Cady, 413 U.S. at 447-448 (where officer's conduct falls within community caretaking function, no search or seizure in constitutional sense occurs); Evans, 436 Mass. at 372 (interactions within community caretaking function "do not

require judicial justification").  Cf. Gonsalves, 445 Mass. at 9

("Questioning by law enforcement agents to secure a volatile

scene or establish the need for or provide medical care is not

colloquially understood as interrogation -- it is not commonly

understood as related to the investigation or prosecution of a

crime" [footnote omitted]).

b.  Mental impairment instruction.  The defendant also

maintains that the judge erred in denying his request for a

mental impairment instruction.  However, as early as the hearing

on the motion to suppress, defense counsel explained that the

defendant did not want to pursue a defense based on mental

impairment:

> "[W]e're in a situation with this case what defense [sic] we're going to go with; whether it's going to be a mental health or a reasonable doubt defense, if you will -- identification.  My client has indicated that he would rather go with the reasonable doubt identification defense."[24]

The defendant then filed the motion in limine to "exclude

evidence of the defendant's mental health diagnosis . . . [and]

institutional commitments," which was "allowed generally."

In turn, the prosecutor repeatedly affirmed that he "[did]

not intend to get involved with" the defendant's mental health

---

[24] Appellate counsel represented that his own investigation into the case revealed that the defendant was competent to make this decision.  See discussion, infra, on a defendant's constitutional right to choose whether to raise a mental impairment defense.

issues in his direct examination of witnesses and would not "ask those questions," in view of the ruling on the motion in limine. Before the New Jersey police officers testified, defense counsel noted:  "I know you have exclud[ed] references to [the defendant's] mental health diagnosis, so in advance of their testimony I would want to alert the court that I would be objecting to any answers regarding his mental health, or their opinion that he was having some mental health breakdown on that particular occasion."

The defendant first requested the instruction after the Commonwealth had rested, arguing that the instruction was warranted principally in view of the New Jersey officers' testimony concerning the defendant's behavior on the day following the discovery of the victim's body.[25]  But even at the charge conference, defense counsel reiterated the defense strategy of challenging the Commonwealth's ability to meet its burden of showing, beyond a reasonable doubt, that the defendant was the person who killed the victim.  Defense counsel explained:

_____

[25] Specifically, defense counsel focused on "the booking photos, the appearance, his irrational statements during that . . . interaction with Mount Laurel [police department], his rants about being an employee of the Department of Interior but he doesn't get paid -- things of that nature," along with testimony that "he seemed to be acting irrationally or strangely to them."

> "[E]ven though we're not arguing it, I think there's a lot of evidence of some sort of mental illness, if you will, that's kind of seeped into the case. Obviously, I've tried to keep . . . as much as possible out, but most of the evidence that's been admitted which would point to that would be through the [C]ommonwealth, really -- the voice-mails, the dash-cam cruiser video, and his statements, the booking photos, the behavior, the irrational statements. He drives until he runs out of gas[oline] -- I think there is some evidence of mental illness in this case. We didn't want it in and I'm not going to argue it, but I think the court is required to instruct the jury on it if there's facts in evidence that would justify an instruction."

The prosecutor objected to the defendant's request for the instruction, contending that, based on the allowance of the motion in limine, he had "[done his] best to limit any [statements about any mental impairment] from the witnesses." Defense counsel responded that, while he had tried to keep out as much mental health evidence as possible, some evidence of the defendant's bizarre behavior, nonsensical statements, and disheveled appearance had been admitted. The trial judge declined to give the instruction, explaining that there was insufficient evidence of mental impairment and that he "[did not] view mental impairment to be a live issue in this case."

"[W]here evidence of the defendant's mental impairment is significant and where it is a critical aspect of [the defendant's] defense, the failure to instruct the jury that they could consider evidence of that impairment" is error.

Commonwealth v. Rutkowski, 459 Mass. 794, 799 (2011).[26]  To be entitled to a mental impairment instruction, "a defendant must, at a minimum, introduce evidence that such an impairment existed at the time of the conduct in question."  Commonwealth v. Santiago (No. 2), 485 Mass. 416, 426-427 (2020).  Here, at the defendant's own request, no evidence of mental impairment at the time of the killing was introduced.

Moreover, although expert testimony is not required,[27] see Santiago, 485 Mass. at 425, the evidence of the defendant's disheveled appearance on the day after the victim's body was found, his choice of summer clothing in winter, his confrontational manner with the New Jersey officers, his claimed unpaid employment with the Department of the Interior, and his otherwise "bizarre" or "odd" behaviors were not "significant" evidence of mental impairment.  Compare Commonwealth v. Doughty, 491 Mass. 788, 800 (2023) (no mental impairment instruction

---

[26] Evidence of a defendant's mental impairment "bears on the specific intent required for murder in the first degree based on deliberate premeditation," Commonwealth v. Gould, 380 Mass. 672, 682 (1980), and also on the defendant's "ability to make a decision in a normal manner," relevant to "whether the murder was committed with extreme atrocity or cruelty," id. at 685-686.

[27] In connection with his consideration of the requested instruction, the trial judge mentioned the failure of the defendant to offer any "formal opinion evidence."  Of course, a mental impairment instruction can be warranted even in the absence of expert testimony.  See Santiago, 485 Mass. at 425.  Here, however, the judge was correct that the evidence presented was insufficient, as explained infra.

required based on testimony defendant was "odd," including strange behavior and statements after killing), with Rutkowski, 459 Mass. at 796-799 (mental impairment instruction required based on evidence of defendant's "long history of mental illness," including hospitalizations and diagnoses).

Further, far from being a critical aspect of the defense, the defendant repeatedly made clear that he was not pursuing a mental impairment defense. Rather, as discussed supra, he intended to focus the defense on challenging the prosecution's ability to meet its burden of proof in identifying him as the killer. Even in closing argument, defense counsel did not mention mental impairment, instead raising questions regarding the prosecution's proof that the defendant was the killer. Compare Rutkowski, 459 Mass. at 799 ("The sole defense in this case was lack of criminal responsibility and its closer relative, mental impairment").

On this record, the trial judge did not abuse his discretion in declining to give a mental impairment instruction.

c. Certainty of fingerprint testimony. The defendant contends that the Commonwealth's fingerprint analysis expert impermissibly suggested a level of scientific certainty regarding his testimony that the fingerprints found on the bag that covered the victim's head when the victim's body was found matched those of the defendant. The defendant did not object to

the expert's testimony.  Accordingly, we examine the testimony to determine whether it was improper and, if so, whether it created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Fulgiam, 477 Mass. 20, 43, cert. denied, 138 S. Ct. 330 (2017).

The defendant principally relies on a report published by the National Research Council from the National Academy of Sciences in 2009, which we previously have considered and have recognized evinces certain limitations of ACE-V[28] fingerprint analysis -- the same framework employed by the expert in the present case.  See Commonwealth v. Gambora, 457 Mass. 715, 724-726 (2010), citing National Research Council, Strengthening Forensic Science in the United States, A Path Forward 102-104, 136-145 (2009) (NAS report).[29]  "Ultimately, the [NAS] report

---

[28] ACE-V stands for analysis, comparison, evaluation, and verification.

[29] We explained that, although fingerprint evidence is not so unreliable that courts should no longer admit it, and "[t]he report does not appear to question the underlying theory . . . [that] there is scientific evidence supporting the theory that fingerprints are unique to each person and do not change over a person's life," Gambora, 457 Mass. at 724-725, citing NAS report, supra at 143-144 & n.34, the uniqueness of fingerprints does not "guarantee that prints from two different people are always sufficiently different that they cannot be confused, or that two impressions made by the same finger will also be sufficiently similar to be discerned as coming from the same source."  Gambora, supra at 724-725, quoting NAS report, supra at 144.  The report "stress[ed] the subjective nature of the

focuse[d] on the need to prevent overstatement of the accuracy of fingerprint comparisons . . . ." Gambora, supra at 726. In light of the NAS report, we gave the following guidance in Gambora: "[t]estimony to the effect that a latent print matches, or is 'individualized' to, a known print, if it is to be offered, should be presented as an opinion, not a fact, and opinions expressing absolute certainty about, or the infallibility of, an 'individualization' of a print should be avoided." Id. at 729 n.22.[30] See Commonwealth v. Joyner, 467 Mass. 176, 183 n.9, 184-185 (2014) ("Gambora permits a fingerprint expert to opine on whether two fingerprint match,"

---

judgments that must be made by the fingerprint examiner at every step of the ACE-V process," Gambora, supra at 725, explaining:

> "ACE-V provides a broadly stated framework for conducting friction ridge analyses. However, this framework is not specific enough to qualify as a validated method for this type of analysis. ACE-V does not guard against bias; it is too broad to ensure repeatability and transparency; and does not guarantee that two analysts following it will obtain the same results. For these reasons, merely following the steps of ACE-V does not imply that one is proceeding in a scientific manner or producing reliable results."

Gambora, supra at 725-726, quoting NAS report, supra at 142.

[30] We noted "tension in the report between its assessments that, on the one hand, 'it seems plausible that a careful comparison of two impressions can accurately discern whether or not they had a common source,' . . . but that, on the other, 'merely following the steps of ACE-V does not imply that one is proceeding in a scientific manner or producing reliable results.'" Gambora, 457 Mass. at 729 n.22, quoting NAS report, supra at 142.

and "[t]he weight and credibility to be accorded the identification evidence . . . was for the jury to determine").

Here, the Commonwealth's fingerprint expert framed his conclusions that the defendant' fingerprints matched those on the bag as "opinions" to a "reasonable degree of scientific certainty."[31]  See Gambora, 457 Mass. at 729 n.22.  The opinions were not presented as facts or as infallible.  Compare Fulgiam, 477 Mass. at 44-45 (expert improperly testified "that individualization signifies that the print examiner has 'come[] to the conclusion that there is a sufficient amount of quality and quantity of those details between the latent print and the known fingerprint . . . to establish that the latent [fingerprint] originated from the known print" and that "on

---

[31] After the date of the trial in the present matter, we clarified that, prospectively from the date of our decision, "an expert testifying to a fingerprint match must state expressly that the match constitutes the expert's opinion based on the expert's education, training, and experience"; "[i]t is not enough . . . for the expert to avoid testifying that the match is one hundred percent certain." Commonwealth v. Robertson, 489 Mass. 226, 238, cert. denied, 143 S. Ct. 498 (2022).  We suggested that the prosecutor ask "whether the witness has an opinion 'to a reasonable degree of fingerprint analysis certainty,'" analogizing to our holdings in ballistics cases (emphasis added).  Id. at 238, citing Commonwealth v. Pytou Heang, 458 Mass. 827, 848 (2011).  See Pytou Heang, supra at 848-849 ("expert may offer . . . opinion to a 'reasonable degree of ballistic certainty," but "[p]hrases that could give the jury an impression of greater certainty . . . should be avoided," and "[t]he phrase 'reasonable degree of scientific certainty' should also be avoided because it suggests that forensic ballistics is a science, where it is clearly as much an art as a science").

several occasions . . . she individualized fingerprints of the defendants to latent prints found at the scene of the crime" without "clearly fram[ing] the[] findings in the form of an opinion").

The expert's description of the ACE-V process as a "scientific methodology" arguably verged on suggesting that the ACE-V process is more scientific than warranted.  Gambora, 457 Mass. at 726, quoting NAS report, supra at 142 ("merely following the steps of ACE-V does not imply that one is proceeding in a scientific manner").  While he clarified that the process involved a "subjective analysis," he coupled that statement with the assertion that ACE-V involved "an objective evaluation."[32]  See Joyner, 467 Mass. at 181 n.6 (noting "subjective nature of the judgments that a fingerprint examiner makes in conducting each step of the ACE-V methodology"). Still, viewed as a whole, his testimony on direct examination did not claim that the ACE-V process was infallible or absolutely certain, and his opinions based on the process were expressed as "opinions."

---

[32] In response to the prosecutor's question whether an identification was "an opinion of the expert looking at the sample for the individualization," the expert said:  "Yes. Well, it's a subjective analysis with an objective evaluation. Again, it's a scientific method."

The expert's testimony on cross-examination was more troublesome. When asked by defense counsel whether fingerprint analysis was "a science like DNA," the expert answered that "[i]t is a science" and that he applied "a scientific methodology." In response to defense counsel's inquiry regarding the subjective nature of the evaluation, the expert answered that "it's a subjective analysis which leads to an objective conclusion based on the -- over the 120 years of the fingerprint science." And when defense counsel noted the NAS report's criticism of examiners "for placing a hundred percent infallibility, a zero error rate, . . . with respect to fingerprint examination," the expert responded:

> "The zero error rate attributed to examiners is kind of a fallacy. The zero error rate is more attributed to the ACE-V methodology, and whether or not the examiner applies it correctly. I would say that there is an error rate in the general field for the examiner, but it's on the examiner's end, it's not on the scientific methodology."

This testimony suggested that ACE-V is a time-tested scientific methodology leading to an objective conclusion, as opposed to a framework that includes subjective aspects and as to which the NAS report has raised concerns. See Gambora, 457 Mass. at 724-725. Although acknowledging that fingerprint examiners generally might make errors, the testimony suggested that the ACE-V methodology itself was error-free and arguably suggested that an examiner, who was faithful to the methodology, could

come to an infallible conclusion.  If elicited on direct examination, such testimony would have been error.  See Commonwealth v. Wadlington, 467 Mass. 192, 205 (2014) (would be error for prosecutor to elicit statement that "[i]f a fingerprint examiner trained in competency follows the scientific methodology of ACE-V, then the error rate should be zero").

"Because this testimony occurred on cross-examination, however, and because there was no motion to strike, we identify no error in this testimony, much less an error sufficient to create a substantial likelihood of a miscarriage of justice." Commonwealth v. Drayton, 473 Mass. 23, 30 (2015), S.C., 479 Mass. 479 (2018).  See Wadlington, 467 Mass. at 206 ("there was no motion to strike, and . . . admission under the circumstances, particularly given the totality of the inculpatory evidence, did not create a substantial likelihood of a miscarriage of justice").

"[A]s in Gambora, we note that the vigorous cross-examination of the analyst countered any possible misconception that individualization is infallible." Fulgiam, 477 Mass. at 45.  Defense counsel, for example, elicited testimony from the expert regarding the NAS report's critique of fingerprint analysis as not being based in a statistical model; counsel also inquired about an incident in which the Federal Bureau of

Investigation erroneously identified a suspect in a 2004 train bombing in Madrid, Spain, based on a faulty fingerprint analysis using the ACE-V framework.  Moreover, the defendant presented his own expert, who disputed the Commonwealth's expert's opinions as to the fingerprints on the bag.

Most importantly, "the Commonwealth's evidence linking the defendant[] to the crime, separate and apart from the fingerprint evidence, was strong."  Fulgiam, 477 Mass. at 45. The victim was last seen looking for the defendant, and subsequently picked up the defendant from a quick serve food establishment in his truck; a cup and receipt from the establishment were in the victim's home when the victim's body was found, along with the defendant's belongings, including his identification card, leather jacket, and cell phone.  There were no signs of forced entry in the victim's home, and the defendant was found with two sets of keys to the front door, which the killer seemingly locked from the outside.  On the morning of the day that the victim's body was found, the defendant was driving the victim's truck, which the victim had previously denied him permission to drive, and was looking for adhesive to reattach the sideview mirror, which was found later in the victim's home. The defendant left a note for his brother-in-law about the victim and fled the Commonwealth; when he was found in New Jersey, he admitted that the victim was upset with him over the

sideview mirror.  Given the strength of this evidence, the erroneous testimony did not create a substantial likelihood of a miscarriage of justice.[33]

d.  Review under G. L. c. 278, § 33E.  The defendant argues that his mental health history, the evidence of which he has provided to us on appeal but was not introduced at trial, and the circumstances surrounding the killing warrant relief under G. L. c. 278, § 33E.  He contends that this was a minor controversy that exploded into a spontaneous killing of the victim, which cuts against premeditation, citing Commonwealth v. Baker, 346 Mass. 107, 110, 119 (1963) (allowing § 33E relief where "a minor controversy . . . explode[d] into the killing of a human being" and "the [defendant and the victim] were acquainted only slightly, if at all"), and Commonwealth v. Williams, 364 Mass. 145, 152 (1973) (allowing § 33E relief where defendant, who carried no weapon, reacted with violence when discovered in robbery intended to be nonviolent such that "[t]he entire sequence reflect[ed] spontaneity rather than premeditation").  He also maintains that a reduction in the

---

[33] The evidence was strong as to both theories of murder in the first degree on which the defendant was convicted.  The beating was astounding in nature, including fractured ribs, multiple blows, and the affixing of a bag over the victim's head with a belt, causing asphyxiation by strangulation, evidencing extreme atrocity or cruelty.  And the placing of the bag on the head after the beating, while the victim was still living, evidenced deliberate premeditation.

degree of guilt is warranted based on his relationship with the victim and his mental illness, citing Commonwealth v. Seit, 373 Mass. 83, 94-95 (1977) (allowing § 33E relief where "no indication of animosity between [the defendant and the victim] until the episode in suit" and defendant may have acted in excessive self-defense or in passion upon provocation or sudden combat), and Commonwealth v. Concepcion, 487 Mass. 77, 95, cert. denied, 142 S. Ct. 408 (2021) (allowing § 33E relief where defendant was fifteen years old, functioned at level of ten year old, suffered from depression and posttraumatic stress disorder, and shot victim under pressure by members of gang).  The defendant directs the court to his mental health records, indicating a history of hospitalizations for mental health issues.

The Commonwealth responds that the defendant's personal characteristics do not, by themselves, warrant a reduction, see Concepcion, 487 Mass. at 95 ("Mental illness alone is generally insufficient to support a verdict reduction under G. L. c. 278, § 33E . . ."), and the verdict as to premeditation is otherwise supported by the weight of the evidence, see Commonwealth v. Ruci, 409 Mass. 94, 98 (1991) ("a primary consideration is whether the killing reflects spontaneity rather than premeditation" [quotation and citation omitted]).

"Our duty is not to sit as a second jury but, rather, to consider whether the verdict returned is consonant with justice" (quotation and citation omitted).  Commonwealth v. Dowds, 483 Mass. 498, 512 (2019).  Baker and Williams are inapt; this is not a case in which "[t]he weight of the evidence . . . indicates murder in the second degree" because "[t]he entire sequence reflects spontaneity rather than premeditation." Williams, 364 Mass. at 151-152.  See Baker, 346 Mass. at 119 ("justice will be more nearly achieved by concluding that the intention to shoot was formed in the heat of sudden affray or combat").  The circumstances of the patricide, shortly after reconciliation, do not affect the justness of the verdict.  The defendant struck the victim multiple times in the head and torso.  While the victim was still living, the defendant placed a garbage bag over his head and tied a belt around his neck, strangling him.  "The facts of this case do not even hint of spontaneity."  Ruci, 409 Mass. at 98.

The defendant chose not to present to the jury an argument that his mental illness prevented him from forming the requisite intent, instead exercising his constitutional right to argue that the Commonwealth had insufficient evidence to prove him guilty beyond a reasonable doubt.  The defendant made this choice, and there is no suggestion that he was incompetent to make it.  See Commonwealth v. Velez, 487 Mass. 533, 544 (2021)

("a competent defendant maintains autonomy over the decision whether to assert a mental health defense").  See also McCoy v. Louisiana, 138 S. Ct. 1500, 1505 (2018) ("it is the defendant's prerogative, not counsel's, to decide on the objective of this defense:  to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt"); Commonwealth v. Miranda, 484 Mass. 799, 818-819, cert. denied, 141 S. Ct. 683 (2020), quoting Jones v. Barnes, 463 U.S. 745, 751 (1983) (under Sixth Amendment to United States Constitution and art. 12 of Massachusetts Declaration of Rights, "the defendant always retain[s] exclusive authority to make 'certain fundamental decisions' regarding his own defense, including whether to insist on his innocence or accept responsibility for a lesser offense").  We will not now undo this decision.

     After a review of the entire record, we discern no error warranting relief under G. L. c. 278, § 33E.

                              Judgments affirmed.